Suraj DIXIT, Plaintiff,

v.

The CITY OF NEW YORK DEPART-
MENT OF GENERAL SER-
VICES, Defendant.

No. 94 Civ. 8872(HB)(JCF).

United States District Court,
S.D. New York.

July 2, 1997.

Patrick Gatins, McKernan & Gatins, Staten Island, NY, for Plaintiff.

Paul Aronson, Asst. Corp. Counsel, New York City, for Defendant.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

The plaintiff, Suraj Dixit, brings this employment discrimination action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Mr. Dixit contends that the City of New York Department of General Services ("DGS") discriminated against him on the basis of his race, national origin, and religion by denying him opportunities for advancement and promotion. Mr. Dixit further claims that DGS fired him in retaliation for complaints he made concerning this discriminatory treatment. Pursuant to 28 U.S.C. § 636(c), the parties have consented to referral of this case to me for all purposes including final disposition.

DGS now moves for summary judgment dismissing the plaintiff's claims of discriminatory treatment on the ground that they were never raised in Mr. Dixit's administrative complaint filed with the United States Equal Employment Opportunity Commission ("EEOC"). In the alternative, DGS argues that any discriminatory treatment claims arising prior to April 1, 1992 are time-barred. Finally, DGS seeks summary judgment on the plaintiff's retaliation claim on the ground that Mr. Dixit cannot establish a prima facie case. For the reasons set forth below, the defendant's motion is granted in part and denied in part.

*Background*

Mr. Dixit is an Asian Indian and an adherent 'of the Hindu Brahmin religion. Affidavit of Suraj Dixit dated April 30, 1997 ("Dixit Aff."), ¶ 9. In December 1985, he began work as a construction manager with DGS. Declaration of Paul Aronson dated March 14, 1997 ("Aronson Decl."), Exh. A. He was appointed program director of the Jails Task Force, a unit responsible for coordinating design and construction of prisons for the New York City Department of Correction ("DOC"). Aronson Decl., Exh. B at 48–51; Exh. H. Initially, his supervisor was Rudolph Rinaldi, Deputy Commissioner of DGS. Aronson Decl., Exh. B at 50–51, 79–80. It is apparently undisputed that for some period of time the plaintiff performed well in his position and received numerous commendations and positive performance evaluations. Dixit Aff., Exh. A—P.

However, this situation began to change in 1990 when Arthur Symes was appointed Assistant Commissioner at DGS and became Mr. Dixit's supervisor. According to the defendant, Mr. Dixit began having difficulty communicating with officials at DOC. Aronson Decl., Exh. B at 89–92, 101–04; Exh. C. Further problems arose when Mr. Symes assigned Winston Sealey to be a project engineer in the Jails Task Force despite the plaintiff's belief that Mr. Sealey was unqualified. Aronson Decl., Exh. B at 104–06, 113–14, 118–21; Exh. D, E. After Mr. Symes became his supervisor, Mr. Dixit's performance evaluations declined dramatically. Dixit Aff., Exh. Q, R.

Mr. Dixit attributes the change in attitude toward him to his strict adherence to City contracting requirements. Dixit Aff., ¶¶ 8–9. He contends that he was criticized because of his race, national origin, and religion when he refused to violate contract protocols. For example, he alleges that Mr. Symes told him, "You[r] behavior is very white, you're not cooperating." Dixit Aff., ¶ 9. Furthermore, the plaintiff asserts that Deputy Commissioner Rinaldi told him in 1987 that he would not be considered for a promotion because he was not white and did not speak English clearly. Dixit Aff., ¶ 21(a). Similarly, when Mr. Dixit approached Deputy Commissioner Rinaldi in 1989 about a promotion, he was allegedly told, "Get real, you're not going anywhere in City government, you're not white, you have an accent, and you're a male chauvinist pig, every Indian is a male chauvinist pig." Dixit Aff., ¶ 21(b). The plaintiff also avers that when he recommended another employee for promotion in late 1991 and early 1992, Mr. Symes responded that he would not consider the candidate because she was an Indian woman. Dixit Aff., ¶ 21(c). Finally, Mr. Dixit states that another deputy commissioner suggested that he might be uncooperative because of his religion since Brahmin consider themselves superior. Dixit Aff., ¶ 21(d).

On July 15, 1997, Mr. Dixit met with Robert Savage, DGS's director of personnel. Ar-

onson Decl., Exh. B at 141–42. The plaintiff states that he arranged this meeting to discuss his concerns regarding racial and religious comments made to him. Dixit Aff., ¶ 18. When he met with Mr. Savage, Mr. Dixit complained that he was being treated differently from other employees, but he did not explicitly attribute this to any factor such as his religion or national origin. Aronson Decl., Exh. B at 143–45. According to the plaintiff, Mr. Savage responded that the matter would be referred to the EEOC for an investigation that could take several months. Aronson Decl., Exh. B at 143–44; Dixit Aff., ¶ 19. On the next day, Mr. Dixit was terminated from his job. Dixit Aff., ¶ 20.

On January 27, 1993, the plaintiff filed an administrative complaint with the EEOC. On the portion of the complaint form asking for "cause of discrimination," Mr. Dixit checked the boxes for religion, national origin, and age. For "dates of discrimination," he identified July 16, 1992, the date of his termination as both the earliest and latest date of discrimination. He described the substance of his charges as follows:

> I have worked for the above referenced Respondent [DGS] since 1985. I am Director of Jails Task Force.
> I am age 52, Asian Indian, of Hindu Boahim [sic] Religion.
> On July 16, I was terminated by Respondent official.
> I believe this action was in retaliation for my complaining to the Personnel Department of the constant harassment, age, national origin and religious discrimination by Respondent's officials, in violation of section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act of 1967, as amended.

Aronson Decl., Exh. N.

On June 30, 1993, DGS submitted to the EEOC a position statement responding to Mr. Dixit's charges. DGS denied that the plaintiff was terminated in retaliation for any complaints and alleged that he had in fact never informed Mr. Savage of any discriminatory treatment. Rather, according to DGS, Mr. Dixit had been terminated for cause, including his lack of cooperation and

failure to respond to DOC staff. Aronson Decl., Exh. O, ¶¶ 4, 5.

On the basis of its investigation, the EEOC issued a determination on September 9, 1994. The EEOC noted that:

> Charging Party alleged that he was discriminated against because of his national origin, Indian, age, fifty-two (52) religion, Hindu Brahma, and in retaliation for having allegedly opposed harassment by his immediate supervisor ... in that he was discharged on or about July 16, 1992.

Aronson Decl., Exh. P.

The EEOC then made the following findings:

> Testimony obtained during the course of this investigation did not support the Charging Party's allegation that he complained of constant harassment by his immediate supervisor due to his age, national origin and religion to the personnel department.

. . . . .

> No evidence of national origin, age, religious, or retaliatory discrimination was uncovered during the course of this investigation.

Aronson Decl., Exh. P. Accordingly, the EEOC concluded that there had been no violation of federal law. Mr. Dixit then filed the instant action.

*Discussion*

A. *Exhaustion*

Prior to filing a Title VII action in federal court, a plaintiff must exhaust administrative remedies. Thus, "[a] district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. City of New York Department of Housing Preservation and Development*, 990 F.2d 1397, 1401 (2d Cir.1993) (citations omitted). In *Butts*, the court identified three situations in which claims can be considered "reasonably related" to the allegations in the EEOC complaint. First, a claim will be deemed sufficiently related if "the conduct com-

plained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* at 1402 (citations and internal quotation omitted). Second, a claim of retaliation for the filing of the EEOC charge itself is so closely tied to the underlying substantive claim that it is considered exhausted. *Id.* Finally, a "third type of reasonably related claim is where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Id.* at 1402–03 (citation omitted).

 In this case, the defendant contends that Mr. Dixit's EEOC charge was limited to a claim of retaliation and that his current claims of discriminatory treatment must therefore be dismissed. If the defendant's characterization of the EEOC proceeding were accurate, this argument would have merit. An administrative complaint limited exclusively to a claim of retaliation is not likely to trigger an investigation of the underlying discriminatory treatment of which the plaintiff complained. This is because a victim of retaliation need only demonstrate that he was engaging in protected activity by making complaints of discrimination, not that the complaints were meritorious. *See Davis v. State University of New York,* 802 F.2d 638, 642 (2d Cir.1986); *Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 410 (S.D.N.Y.1996). Thus, complaints of discriminatory treatment are not exhausted by prior administrative claims of retaliation for complaining of such treatment. *See Williams v. Little Rock Municipal Water Works,* 21 F.3d 218, 222–23 (8th Cir.1994); *Walsh v. National Westminster Bancorp., Inc.,* 921 F.Supp. 168, 172 (S.D.N.Y.1995); *Lee v. Kroger Co.,* 901 F.Supp. 1218, 1224 (S.D.Tex.1995).

However, Mr. Dixit's EEOC charge in this case is not so clear cut. In his narration he does seem to focus on retaliation, and he identifies the only date of discriminatory treatment as the date of his termination. On the other hand, in indicating the nature of the discrimination he was claiming, Mr. Dixit checked boxes for religion, national origin, and age, but not for retaliation. *Cf. Williams,* 21 F.3d at 223 (plaintiff who checked only retaliation box on EEOC form precluded from bringing Title VII action on basis of race). Thus, a close issue would be presented if the EEOC had simply issued a right to sue letter without conducting an investigation. Under those circumstances, it would be necessary to predict whether the plaintiff's ambiguous EEOC complaint could reasonably have been expected to trigger an investigation of alleged discriminatory treatment.

But in this case, no such speculation is required. The EEOC did conduct an investigation that covered not only the plaintiff's claims of retaliation but also allegations of discrimination on the basis of national origin, age, and religion. This is clear from the EEOC's determination, which specifically identifies each of these categories. Thus, the exhaustion requirement has been satisfied with respect to Mr. Dixit's claims of national origin and religious discrimination. *See Paige v. California,* 102 F.3d 1035, 1041 (9th Cir.1996) ("The district court here had jurisdiction over the plaintiffs' claim of class discrimination in promotion if that claim fell within the scope of the EEOC's actual investigation or an EEOC investigation which could reasonably be expected to grow out of the charge of discrimination.") (citation and internal quotations omitted); *National Association of Government Employees v. City Public Service Board of San Antonio, Texas,* 40 F.3d 698, 711–12 (5th Cir.1994).

 A closer question is presented with respect to Mr. Dixit's claim of race discrimination. An assertion of racial bias is conceptually distinct from a claim of discrimination on the basis of national origin. *See Kun v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 949 F.Supp. 13, 19 (D.D.C.1996); *Schaffrath v. Akron/Summit/Medina Private Industrial Council,* 674 F.Supp. 1308, 1312 (N.D.Ohio 1987). Therefore, raising a claim of national origin discrimination before the EEOC will not suffice to exhaust a charge of discrimination on the basis of race.

 In filling out the EEOC complaint form in this case, Mr. Dixit did not check the box indicating that he believed that he was being discriminated against on the basis of

his race. He did, however, identify himself as an "Asian Indian." Some courts have treated this as a racial category. *See Mody v. City of Hoboken,* 959 F.2d 461, 462, 466 (3d Cir.1992). Others have dealt with it as a designation of national origin. *See Dhuria v. Trustees of University of District of Columbia,* 827 F.Supp. 818, 819–20, 827 (D.D.C. 1993); *Jindal v. New York State Office of Mental Health,* 728 F.Supp. 1072, 1073–74, 1076 (S.D.N.Y.1990). In general, "Asian Indian" is most commonly a characterization of both race and national origin, since it denotes someone with Asian racial characteristics whose ethnic background is Indian. *See Saini v. Bloomsburg University Faculty,* 826 F.Supp. 882, 884, 887 (M.D.Pa.1993).[1]

Under these circumstances, the EEOC can reasonably be expected to investigate both racial and national origin bias when a complainant claims to have been discriminated against because he is an Asian Indian. In this case that expectation was reinforced when, in responding to Mr. Dixit's EEOC charge, the defendant explicitly treated "Asian" as a designation of race. The response states, "We can neither affirm nor deny that Complainant is Asian Indian, of Hindu Boahim [sic] Religion. The New York City Department of General Services' computerized personnel tracking system indicates Complainant's race is Asian. However, this tracking system does not provide information regarding an employee's national origin or religion." Aronson Decl., Exh. O, ¶ 3. Therefore, the plaintiff's claim of discrimination on the basis of race is also adequately exhausted.

### B. *Statute of Limitations*

In general, a discrimination claim under Title VII must be filed with the EEOC within 180 days of the date when the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e–5(e)(1). However, in states like New York that have their own antidiscrimination laws and enforcement agency, the limitations period for filing claims with the EEOC is 300 days. *Id.; Ford v. Ber-*

*nard Fineson Development Center,* 81 F.3d 304, 307 (2d Cir.1996). Any claim not brought within this period is time barred and may not be the basis for relief in federal district court. *See Butts,* 990 F.2d at 1401. In this case, Mr. Dixit filed his administrative complaint with the EEOC on January 27, 1993. Aronson Decl., Exh. N. Accordingly, the defendant argues that the plaintiff is now barred from asserting any claims for alleged discriminatory acts that occurred prior to April 1, 1992, which was 300 days before the filing date.

■ In response, Mr. Dixit contends that his termination was merely the culmination of a continuing violation of Title VII, such that acts of discrimination prior to April, 1992 may be considered.

Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.

*Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir.1993) (citations omitted). The continuing violation doctrine applies most commonly "when there is evidence of an ongoing discriminatory policy or practice, such as use of discriminatory seniority lists or employment tests." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996). In addition, a continuing violation may be found "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Id.* (quoting *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994). However, discrete acts of discrimination that are not shown to be the product of a policy or practice do not constitute a continuing violation. *See Van Zant,* 80 F.3d at 713; *Cornwell,* 23 F.3d at 704.

---

1. "Asian" of course, could simply be a geographical term intended to distinguish a resident of the subcontinent of India from an inhabitant of the West Indies. In that circumstance, there is no racial dimension to the designation "Asian Indian." However, it is clear from the context that that is not how the term was being used in this case.

As set forth in his complaint and reiterated in his affidavit opposing summary judgment, Mr. Dixit complains of several instances of discriminatory treatment. First, he alleges that he was denied consideration for promotion in the summer of 1987 by Deputy Commissioner Rudolph Rinaldi because he was not white and did not "speak clearly." Compl. ¶ 10; Dixit Aff., ¶ 21(a). Second, the plaintiff asserts that in 1989 or 1990, when he asked about being promoted, Deputy Commissioner Rinaldi advised him to forget it, since he was not white, had an accent, and, like "every Indian," was a male chauvinist. Compl. ¶ 12; Dixit Aff., ¶ 21(b). Next, Mr. Dixit avers that when he recommended an applicant for a job vacancy in late 1991 and early 1992, Assistant Commissioner Arthur Symes said he would not consider hiring an Indian woman. Compl. ¶ 13; Dixit Aff., ¶ 13. Finally, at unspecified times during his employment, Mr. Dixit perceived that he was being labeled as uncooperative. He then raised this issue with Deputy Commissioner Bob Landesman, who allegedly suggested that the problem might be that Mr. Dixit felt himself superior because he was a Brahmin. Compl. ¶¶ 14, 15; Dixit Aff., ¶ 21(d).

These alleged acts do not constitute continuing violations. In *Johnson v. Nyack Hospital*, 891 F.Supp. 155, 163 (S.D.N.Y. 1995), the court identified three factors to be considered in determining whether alleged discriminatory acts are discrete, independent events or elements in a continuing violation. These factors are: (1) whether the alleged acts all involve the same type of discrimination, (2) whether they recur frequently or are more in the nature of isolated employment decisions, and (3) whether they exhibited a degree of permanence that should trigger the employee's duty to assert his rights. *Id.* Here, Mr. Dixit alleges that he was not considered for promotion in 1987 and again 1989 or 1990 because of his race and national origin. However, he attributes subsequent conflicts on the job to religious stereotyping. Moreover, the bias that the plaintiff purportedly confronted was expressed to him by different supervisors. While Deputy Commissioner Rinaldi allegedly referred to race and national origin when denying Mr. Dixit consideration for promotion, it was Deputy Commissioner Landesman who referred to his religion as a possible source of his uncooperativeness. Still a third supervisor, Assistant Commissioner Symes, allegedly refused to consider the promotion of another employee because of her national origin, though Mr. Dixit does not allege that he suffered any adverse employment action because of this incident. These events are not sufficiently related in terms of subject matter to evince a discriminatory policy or practice on the part of the employer, DGS. *See Boyle v. McCann–Erickson, Inc.*, 949 F.Supp. 1095, 1106–07 (S.D.N.Y.1997) (no continuing violation because claims of age discrimination not related to allegations of national origin discrimination); *Neilson v. Colgate–Palmolive Co.*, No. 94 Civ. 7643, 1997 WL 297051, at *1 (S.D.N.Y. June 4, 1997) (multiple instances of failure to promote by different supervisors not evidence of continuing violation).

Nor are the discriminatory acts alleged by Mr. Dixit temporally related in a way that would indicate a continuing violation. Mr. Dixit recounts two denials of promotion two years apart and conflict with other employees at some unspecified time thereafter. These events appear isolated and cannot establish a policy or practice.

The third factor also militates against a finding of a continuing violation. Once Mr. Dixit was denied consideration for promotion, allegedly on the explicit grounds of his race and national origin, he could have reasonably been expected to assert his rights at that time. That denial of promotion was a completed act, not a continuing violation. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997) (repeated "demotions" and denials of pay-grade increases were completed acts not continuing in nature); *Pauling v. Secretary of the Department of Interior*, 960 F.Supp. 793, 801–02 (S.D.N.Y.1997) (multiple failures to promote not a continuing violation).

Thus, Mr. Dixit has failed to establish a continuing violation that would permit him to assert claims beyond the limitations period. He has never alleged the systemic use of a discriminatory instrument such as a seniority

list. He has merely asserted the existence of a discriminatory policy based on various acts. Although this might suffice for purposes of stating a claim, "[s]ummary judgment is designed to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict." *Lightfoot,* 110 F.3d at 907. This is such a case. The evidence proffered by the plaintiff is simply insufficient to demonstrate a continuing violation. Therefore, Mr. Dixit may not assert a claim for any acts prior to April 1, 1992.

### C. *Retaliation*

█ Finally, DGS argues that it is entitled to summary judgment on the plaintiff's retaliation claim. The defendant contends that Mr. Dixit's own deposition testimony shows that he never complained to DGS or to any governmental agency about discrimination on the basis of race, religion, or national origin prior to his termination. Therefore, according to DGS, Mr. Dixit did not engage in protected activity and cannot have been the victim of retaliation.

The plaintiff testified in his deposition that he met with the personnel director of DGS on July 15, 1992 because he had heard rumors that his job was in jeopardy. Aronson Decl., Exh. B at 141. Mr. Dixit described this meeting as follows:

I basically told him, I said, this is what is going on and all of these things, like I was not given the evaluation, the form I signed was a blank form, and all of these rumors are going on. He is not participating with me, and I am kept at a distance from being involved in the process or kept abreast with their thinking is. Basically, I am feeling the pressure because I am being treated differently. So, at that time he said, "Oh, this is going to delay everything." I said, "What do you mean?" He says, "It's going to delay the things for three or four months more now until the investigations are over."

Aronson Decl., Exh. B at 143–44. After Mr. Dixit had testified at the deposition about complaining to Mr. Savage of differential treatment, the following exchange took place:

Q. What did you attribute this to? Did you attribute this to anything?

A. I said, "All of these issues need to be looked into." I said, "I was racially discriminated—" I didn't use that, I said, "I am being treated differently, it is not the normal response I am supposed to get from the management, other people are not being treated this way," so I think he understood what I was meaning.

Q. So, is my understanding that you didn't say I am being treated differently because I am Indian to them?

A. I didn't use that word, no. I was scared not to do it because I was looking for resolution of the problem, I was not looking for a confrontation.

Aronson Decl., Exh. B at 145.

In his affidavit in opposition to summary judgment, the plaintiff again describes his meeting with Mr. Savage. He states:

On the morning of July 15, 1992, I made a telephone call to the Assistant Commissioner for Personnel to discuss my growing concerns regarding the racial, religious and other comments that were made to me. The Assistant Commissioner directed me to meet with Mr. Robert Savage of Defendant's Personnel Department to express my concerns about the treatment I was receiving.

On the evening of July 15, 1992, I met with Mr. Robert Savage of Defendant's Personnel Department to express my concerns about the treatment I was receiving. After hearing my concern, Mr. Savage advised me that the matter would have to be referred to the E.E.O.C. and that the investigation could take several months.

Dixit Aff., ¶¶ 18–19.

The defendant argues that the allegations in the affidavit contradict Mr. Dixit's deposition testimony and therefore must be disregarded. *See Hayes v. New York City Department of Corrections,* 84 F.3d 614, 619 (2d Cir.1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). However, there does not appear to be any direct contraction. While Mr. Dixit states in his affidavit that he intended to discuss his concerns

regarding racial and religious discrimination, he does not suggest that he actually used these words in his meeting with Mr. Savage. Rather, the plaintiff continues to assert simply that Mr. Savage understood the import of his complaints about differential treatment.

■ Certainly, a plaintiff's subjective belief that he has been discriminated against on the basis of race, religion, or national origin cannot be the basis for a retaliation claim unless a complaint is effectively communicated to the appropriate authority. "To make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity; *that the employer was aware of that activity;* that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action." *Manoharan v. Columbia University College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988) (emphasis added, citations omitted). Mr. Dixit's mere assertions that he met with Mr. Savage intending to complain about discrimination therefore would not suffice.

Mr. Dixit's allegations go further than this, however. He asserts that when he complained of disparate treatment, Mr. Savage replied that this would necessitate an investigation. Aronson Decl., Exh. B at 144. Furthermore, in his affidavit, the plaintiff avers that Mr. Savage said that the matter would have to be referred to the EEOC. Dixit Aff., ¶ 19. If credited, this evidence would indicate that Mr. Savage construed Mr. Dixit's complaint to relate to some form of proscribed discrimination, since the EEOC only has jurisdiction over claims of that nature. Thus, even if Mr. Dixit's complaint were wholly ambiguous, once Mr. Savage interpreted it as alleging discrimination prohibited by Title VII, it necessarily became protected activity. And, since the complaint was made directly to Mr. Savage, DGS was aware of it.

■ The defendant also argues that even if Mr. Dixit engaged in protected activity, there is no evidence showing a causal connection between that activity and his termination. There is, indeed, no direct proof that DGS's motive in firing Mr. Dixit was to

retaliate against him for asserting his Title VII rights. But such direct evidence of discriminatory or retaliatory intent is rare and is not necessary for a prima facie case. *See Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir.1997). In this case a jury could infer a causal connection based on the proximity in time between Mr. Dixit's complaint to Mr. Savage and his termination the very next day. *See Batson v. Powell,* 912 F.Supp. 565, 577 n. 15 (D.D.C.1996) ("Causality can be inferred when an adverse employment action follows shortly after participation in protected activity."). Therefore, summary judgment is inappropriate with respect to the retaliation claim.

### Conclusion

For the reasons set forth above, the defendant's motion for summary judgment is granted to the extent that the plaintiff may not recover for alleged discriminatory acts that took place prior to April 1, 1992. The motion is otherwise denied.

Counsel shall submit a joint pretrial order, proposed voir dire questions, and requested jury instructions by July 31, 1997.

SO ORDERED.